The third case of the morning is number 2430646, Williams v. GoAuto Insurance Company and we'll hear first from Mr. Simeon. May it please the court, Euless Simeon on behalf of the appellant. This appeal is from a ruling of the party's cross motions for summary judgment which dealt with a purely legal question related to the process by which GoAuto cancels its policies, a process that we believe is improper under Louisiana law. There were no real disputes in the facts related to this limited motion that was before the court. However, the trial court ruling which granted the defendant's motion and denied the plaintiff's motion for summary judgment was based on an incorrect application of those facts to the Louisiana law. This matter was removed from state court where we could have gotten a definitive ruling on these issues of state law and the place that would be the best forum to do that. However, if this court is not convinced that the position that we take on the law is correct, because there is outstanding case law that supports the positions that we take on these areas, then the matter should be certified to Louisiana Supreme Court to get a definitive ruling on those issues. As the court is well aware, the question of insurance regulation is a very state specific issue and one that the state of Louisiana has a significant interest in regulating. And so, based on the current state of the law and the extent of law that is out there, we believe the trial court erred. But if this court does not believe it supports that, there is at least sufficient evidence in the law that there might have been an error by the trial court that we need to get a definitive ruling from the Louisiana Supreme Court. So we start with the proposition under Louisiana law that there has to be strict adherence to the requirements for cancellation under Louisiana law. Let me ask you a question. Going to the jurisdiction, as I understand it, there was an earlier motion filed to dismiss applying the Basic Class Action Fairness Act. And the loss of jurisdiction under that statute. There are a lot of reasons why that might have merit. I just wonder what happened to that. Well, Your Honor, we did initially. You're talking about why we didn't continue with the motion to remand, and the merits on that, or? I just noted that there had been this by-play with regard to the Class Action Fairness Act. And literally, under the terms of that statute, you would lose jurisdiction if you don't meet the terms. There are a number of qualifiers there. And it's a question of our jurisdiction, and where are we with that? At this point, we're not contesting the jurisdiction of the trial court. We did file a motion to remand. We withdrew that motion. I know you did, but my question to you is, what's the basis of that? What's the answer to it? The basis why we're drawing the matter, Your Honor, is we decided that we would not proceed with our objections to the removal, because we wanted to get to the merits of this case. And we weren't making any headway of getting towards the merits of this case, as long as that motion was pending. And so we decided to withdraw our motion to remand. Okay. But that doesn't change the fact that the questions still turn on the issues of Louisiana law, and how the proper application of the Erie Doctrine should be applied in this particular case. The thing to remember, as I was saying, is that there has to be strict adherence to the requirements for cancellation. If there are any defects in the process that was used by Go Auto, it makes the cancellation void. And even if it's just one of the requirements, if that is violated, then the cancellation is void. Non-payment by the insured is irrelevant to the inquiry before this court. Certainly, that's a prerequisite, but it's not sufficient to constitute cancellation of policy. If the Louisiana legislature wanted non-payment to be sufficient to constitute cancellation, it would have so said. But it didn't. It says when there's non-payment, these are the steps that you, as an auto insurer, must go through in order to properly cancel this policy. As the record makes clear, all of the defendants in a play together, they're all owned by Go Auto Management Services companies. The premium finance company and the insurance company, which is the only two relevant parties for this particular motion, are all owned by that same party. Now, in this particular case, there were problems with the manner in which Go Auto canceled the policies from the very beginning of its process to this day. For a valid cancellation, the statute requires that the premium finance company send the cancellation request to the insurer by mail, electronic mail, or by private carrier. The district court erred, as a matter of law, in finding that the employee of Go Auto Management Services, who supposedly is acting on behalf of the premium finance company, is a private carrier within the meaning of that statute. There were three possible means. The only one that the trial court relied for sending, and the only one the trial court addressed, was the question of whether this person was a private carrier. Clearly, there was no mailing in this case, not even the defendant's safe position there was mailing. And I'm going to discuss why the middle of the night email does not constitute sending by electronic mail in a few minutes. But I'm going to first focus on what the trial court, in fact, ruled. And that is that this person was a private carrier. Under the Erie Doctrine, the question of whether this employee was a private carrier must be determined under Louisiana methods of interpretation of its statutory law and what those statutes might mean. Absent a clear definition in the statute as to what a private carrier is, the trial court should have looked to case law in similar areas, either on this particular point or in similar areas. But instead, unfortunately, what the trial court did was to look at the definition of private carrier in the context of transportation. Which has nothing to do with these issues. And so, the one Louisiana case that dealt with who's a private carrier for purposes of transportation issues and federal cases that it looked at. In the context of transportation, it makes a lot of sense to say that a private carrier is one who simply agrees to deliver something but does not hold himself out as providing those services to the general public. That makes sense in the context of transportation. However, considering the context of the term private carrier in this statute, when used in the same sense as mail and electronic mail, it becomes clear that the legislature used the term private carrier to designate a private rather than public carrier of things like mail, like the US Postal Service, to refer to entities like FedEx, UPS, and others who hold themselves out to the general public. This is further supported if you take a look at the history of this statute. Originally, the statute only allowed it to be mailed. Then, the legislature changed the statute and said it could be mailed or sent by a private carrier. Sent by mail or by a private carrier, but in both instances, even when it changed the statute to allow it to be brought by a private carrier, it still referred to it as being mailing of the request for cancellation. It's only when it added the term electronic mail that the legislature changed, it eliminated the word mailing and added sending because then it wouldn't be mailing of any form. But certainly, the legislature intent was that when it referred to a private carrier, it was referring to those private carriers that still did mailing services, not the definition that was employed by the court. For a valid cancellation, the insurer must receive the cancellation from the premium finance company. The district court erred in this case in finding that the cancellation request was received by the insurer. It did so first because it made a mistake as to the facts. The facts are undisputed, but unfortunately, the trial court misconstrued the facts and thought that the file cabinet, filing room where it was being placed was owned by the insurer. The facts show that it was not owned by the insurer. It was actually owned by Go Auto Management Services, not by Go Auto Insurance Company. So that was a mistake of facts. But even if you were to assume that the filing room or the filing cabinet were owned by Go Auto Insurance Company, which it was not, even if you were to assume that simply placing the documents in that room is not receipt by the insurer, that might be delivery to the insurer, but it is not receipt to the insurer. And there's a difference between delivery and receipt. Receipt connotes that it is actually received by the insurer. There is some interaction with the documents that are received, and that is further supported by the fact that what we're dealing with is not a notice of cancellation from the premium finance company, but it is a request for cancellation, which then requires action on the part of the insurer. Simply putting it in a room that the insurer might have access to does not constitute a receipt by that insurer. The district court also erred as a matter of law in finding that the changes in 2017 constituted receipt. What happened in 2017, recognizing that they hadn't been even signing anything, they got another Go Auto Management Services employee supposedly working on behalf of the insurance company to sign the first page. They don't flip through the pages, they don't look at the pages, they don't interact with the documents anyway. Sign it and say received. The court found that it didn't have to, but found that it was also receipt after 2017, because obviously it already found lesser action was considered as receipt. This process is also not receipt of the documents because there is no real interaction. This Go Auto Management Services employee simply signs the first page. Now, the trial court did not make any findings relative to this question of this middle of the night email. It didn't go there because it went with the fact that this was a private delivery. The defendants, however, argue that that is a basis to affirm the trial court's conclusion, that even if the trial court was wrong on that, this middle of the night email constitutes sending and receipt by the premium finance company to the insurance carrier. Counsel, I'm a little concerned with the practical effect of the common sense support, at least on the receipt angle. The policy is canceled, and so the notice had to be received. Maybe there's a timing issue as to when it was received. But wasn't the notice of certification, even if it was flawed in some way in delivery, clearly received because the policy was then canceled? Are you referring to the email or are you referring to when the person signed the document in the morning? Well, regardless, a notice needs to be given, delivered, or sent in one of three ways. And it needs to be received. A receipt of that notice is one of the subparts of the statute. All I'm saying is the insurance company received it because they acted on it. Well, they act on it before it's actually even received, unless you go with the email. It automatically – none of this is with human interaction. At 2 o'clock or 2.30 in the morning, the interconnected computer systems cancel the policy. Are you saying this statute somehow implicit humans have to do everything involved in this statute? If so, there's going to have to be some rewriting of the statute because that's not how it's done. I'm not advocating humans have to do everything, Your Honor, but I just want to point out the fact that there is – it's not that the insurance company receives it and therefore it acts. The insurance company acts before it receives, unless you're talking about the email that goes out in the middle of the night. So if you want to – if we're going to talk about that, we have to talk about why that email that goes out in the middle of the night does not actually constitute a valid request under the statute. Under the statute, to be a valid request, it must be accompanied by a statement certified to be true that all of the things have transpired that justify the cancellation. That email is sent out without a signature, without anyone certifying anything. If you take a look at case law in Louisiana, in particular the Benitez case, the Louisiana courts have already decided that a supposed certification that's not signed by anyone is not a certification. No. There's – what was the phrase? You know it better than I. It wasn't a holding. It was doubt or uncertainty or whatever. It's not a holding. I didn't refer to it – it doesn't mean – if I did, I didn't mean to imply I thought it was a holding in the case, but it was, in fact, a statement in the case that it has to be signed in order to be a certificate. I won't quibble with that, but I disagree with it. Thank you, Your Honor. So that is why the email that goes out is not a certification. It is simply something that's generated by the computer, and not everything has to be done by humans, but in order to certify these facts, it has to have a human interaction to certify that it is, in fact, true. The other reason it's not – I'm sorry, my time is up, but I'll finish answering your question if you don't mind. I think you've answered it. We'll see you again before we vote. I think you've answered my question. Thank you. All right. Thank you, Your Honor. All right. Ms. Mintz. Good morning. May it please the Court. When a consumer purchases an insurance policy that's financed by an insurance premium finance company, the structure of the transaction goes like this. The insurance company issues the policy for a set policy period, say six months. The finance company pays the entire premium to the insurance company on day one. The insured agrees with the finance company that they will pay back that loan over a six-month period and equal monthly installments. The insurance policy that's issued to the customer includes a cancellation provision that would allow the customer to cancel the policy at any time and receive a refund of the unearned premium. When the customer enters into the finance agreement with the finance company, they grant a power of attorney to the finance company that allows the finance company to institute cancellation and receive that same unearned premium in the event that there is a default on the monthly payments. So if a six-month policy is issued for $600, the insurance company gets the full $600 at the beginning. The consumer agrees to pay back $100 a month plus applicable finance charges. If the insured defaults after three months, the finance company can send a request for cancellation, get a refund of $300. Separate and apart from that, the provisions of the finance agreement and the policy, Louisiana Revised Statutes 9-3-5-5-0 sets forth a specific procedure that has to be followed when you're going to cancel a policy for nonpayment. First, the finance company has to send the insured a notice that says you didn't make your payment, and if you don't make the payment within 10 days, we're going to exercise our right to cancel the policy. After the 10 days has elapsed, the finance company can request cancellation, and that request has to certify that they sent the 10-day notice and that the default wasn't cured. The insured is not involved in that second process. The only notice that the insured receives is the pre-cancellation 10-day notice. Once the insurance company has sent the notice and waited the 10 days and no payment has been made, they can request cancellation. They are perhaps not required to, but they are required to refund the unearned premium, and I point that out because the plaintiffs argue throughout their briefing that, well, Go Auto's got no interest in this matter. They got their money on day one, but that's not correct because if the insured defaults and a cancellation request is made, the insurer has to refund the unearned premium. Go Auto does have an interest in this case. In this case, APAC requested cancellation, and there can be no dispute that they requested cancellation. They did so in an e-mail and in a printed request. The plaintiffs do not dispute that. What the plaintiffs claim is that there were two defects in the manner in which APAC delivered those cancellation requests. First, the plaintiffs claim that the requests were delivered by an employee assigned to APAC and that that person doesn't qualify as a private carrier. As Mr. Simeon noted, the statute does not define the term private carrier. The plaintiffs argue that it should be limited to commercial delivery services like FedEx and UPS. However, on the issue of what a private carrier is, I think the plaintiffs' own briefing at pages 28 and 29 curiously runs counter to their argument and supports the district court's ruling. The plaintiffs say that in order to ascertain the legislature's intent, the adjective private and the noun carrier must be given their generally prevailing meaning, and the plaintiffs go on to state that the generally prevailing meaning of the term private is nonpublic and the generally prevailing meaning of carrier is one who carries. And here, it's beyond dispute that the employee who delivers the cancellation request is a private person who carries. Counsel, I will say the district judge certainly put the pieces together, you are too, using the English language, but there does seem to be a connotation to the word carrier that it's not just any individual, and it's an odd word to use if it's referring to any private person who is delivering. I'm not saying you accept that or not, but I do think carrier is not the default word to use for delivery by a private individual, even if it's a broader category. Well, I think I would respond to that by saying that there's really no logical reason to limit the term private carrier to FedEx and UPS. I mean, we all, in the practice of law, we use commercial services to deliver pleadings to the court or bring documents down the street to opposing counsel, and that would, I think, serve the same purpose. The purpose of the statute is to ensure actual delivery, and that actual delivery can occur through FedEx, through U.S. Mail, through email, or through private carrier, whether that be . . . Well, it seems to me the legislature could have written this . . . I mean, the important thing is receipt, not so much the matter in which it's being sent. But if you agree that strict compliance with the statute is required under Louisiana law, they didn't say any delivery service that gets the document or email or whatever else to the insurance company. It says you've got to use one of these three ways. So in strict compliance, I'm just concerned about using carrier in as broad a way as the district court found. I think the legislature also could have used bona fide commercial mail service, which is a phrase that does appear in Louisiana revised statutes in other places. Like, if you're delivering papers to the Louisiana Supreme Court, you must do so by bona fide commercial mail service, or U.S. Mail, of course. And so, yes, the legislature, if they intended it to be limited to FedEx and UPS, they could have used more specific language. And I think just the plain meaning of private carrier includes a by-hand delivery. Did you cite any case law or related statute or something else to support that interpretation? Well, the district court relied on the federal cases that distinguish between common carriers and private carriers. And that, while not directly on point, is certainly instructive. We did cite to the statutory provisions that use alternative language, like bona fide commercial mail service. And we were not able to locate any Louisiana state case law specifically dealing with the meaning of private carrier in this context. Alternatively, though, and I think as came up in the other argument, the cancellation requests are emailed. And that is a permitted form of transmission. Now, the plaintiffs claim that the email is defective because no one signed the certification, but there should be no mistake that that email says APAC certifies that, then sets forth the required statements, and then the email closes Sincerely Automotive Premium Assistance Company, or APAC. There is nothing in the statute that requires a wet signature on that email, and that email constitutes delivery of the necessary statements to the insurance company. I've seen an exhibit in the record that is one of these emails. It seems to be an 8.511 sheet of paper as printed out. Is it an attachment to the email? That is correct. So it's a one-page, maybe a multiple-page document. And as sent, it has a blank signature on it? The page one has the thing, and then at the bottom it says Sincerely, and then there's a blank space, and then it says American Premium Assistance Company. And then there are multiple pages that appear behind that because each night there may be 50 or 100 different policies that are subject to cancellation, and so they'll do individual follow-up letters behind it. That same thing is printed out the following morning. That piece of paper that's attached to the email is printed out the next morning, and it is wet signed by somebody from APAC. Well, insofar as strict compliance, that doesn't really work because the way the statute is written, it must be sent in one of these three ways in a manner that satisfies the statute. And if the statute requires a signature, it's not sent with a signature. Well, I think your best argument may be that it doesn't require a signature, but you've made that argument. What about my concern that if you add the signature later, it hasn't been sent properly? The statute does not require a signature. Well, okay, that's your answer. It's not that it's added later and it's got a signature even if the statute required it. Well, yeah, the by-hand delivery has a signature, but a signature is not required. It says that the insurance company, I'm sorry, the finance company, must certify that it's sent over notice of cancellation and that 10 days have gone by and no payment was made. And so what the email fully complies with the requirements of the statute. It seems to me this case may come down to what meaning to give to the word certified. That certainly is an issue that would have to be decided, and I think the plaintiffs argue that certifying. If email is the way to go, then certified may be the key. Yeah. If the court concludes that the delivery is not a private carrier, and then it turns to the issue of whether the email is alternatively sufficient to comply, it would have to decide whether or not a wet signature is required in order to certify something, or is it simply enough to say APAC certifies that and send it. The plaintiff's second argument turns on the receipt requirement, and on this they say that Go Auto never receives the cancellation requests, and I think I can deal with that relatively quickly. The summary judgment evidence that was presented shows that Go Auto employees have access to and utilize these documents in the regular course of business. That's the affidavit of Kim McLeod in the record at 2965. And other summary judgment evidence I think sort of hits this home, and that is that before the plaintiffs filed this lawsuit, they sent a letter to Go Auto and said, We are representing Ms. Williams and we're representing Mr. Jenkins, and we're here to tell you that we're representing them and we need to see the documents pertaining to the cancellation of these policies, and Go Auto wrote back to them and said, Counsel, here are the documents. The very documents that the plaintiffs now say Go Auto didn't receive, Go Auto pulled out of the file cabinet and attached to a letter. So I think it's clear that the plaintiffs, I'm sorry, that Go Auto received the cancellation requests. Now, I think somewhat grasping at straws, the plaintiffs are arguing that these employees are actually employed by GMS and that the who owns the file cabinets, that wasn't an issue that was raised below, but in any event, counsel was incorrect in his remarks. GMS is not the parent company. The parent company is Go Auto LLC, not relevant to the dispute, but Go Auto Management Services is a management company. It is the direct employer of these employees. It may hold title to the file cabinets, but the summary judgment evidence is undisputed that the office and the file cabinets are used by Go Auto to carry out their duties. That's in the McLeod Affidavit and also in the Holland Deposition at 2806. In fact, even the plaintiffs acknowledged in their briefing that the file room is, quote, a file room shared by the two companies. I want to address certification for just a moment. The plaintiffs have asked that perhaps this Court certify one or more of the issues presented to the Supreme Court. I think that this Court's comments in the Jefferson v. Lead Industries case, which was cited in our brief, say it best. In that per curiam from a panel that you were on, Judge Jones, the Court said, quote, we are charry about certifying questions of law absent a compelling reason to do so. The availability of certification is such an important resource to this Court that we will not risk its continued availability by going to that well too often. I don't think the issues presented in this case are complex, and I think they can be decided by this Court, just as they were decided by the District Court. I do want to address the plaintiff's assertion that this dispute is not academic, and I think they say it has real-world implications. And on this, we could not agree more, but we don't agree on what the real-world implications are. The plaintiffs claim that the real-world implication is that GoWATO is, quote, permitted to place the financial interest of its affiliated premium finance company above the interest of its own insurers. We, unsurprisingly, see it differently. Ms. Williams and Ms. Wright do not dispute that each time their policy was canceled, they had failed to pay the monthly premium. They acknowledge that each time they missed a payment, they received a notice of cancellation informing them that their policy would be canceled unless they paid within 10 days, and they failed to do so. They testified that they understood what would happen if they failed to make their payment, and nonetheless, Ms. Williams and Ms. Wright claim that APAC failed to strictly comply with Section 9, colon, 3550, and that their cancellations were, therefore, invalid. But they go one step further, as they must, because 9, colon, 3550 does not create a private right of action, and they have no damages. They weren't in an accident that they made a claim on. They don't seek any damages. Instead, they go one step further by claiming that Louisiana's insurance bad-faith statute, 22-1973, prohibits insurance companies from knowingly misrepresenting facts pertaining to coverage, and that because the cancellations were purportedly defective, any statement Go Auto might have made about the cancellation was an actionable misrepresentation. The penalty under 22-1973 is actual damages or a statutory penalty of up to $5,000, and here the plaintiffs have no damages, so they seek the statutory penalty of $5,000 for each of the 14 times Go Auto canceled their policy for nonpayment. In sum, Ms. Williams and Ms. Wright do not dispute that they failed to pay, but they seek $70,000 in bad-faith penalties from Go Auto, and although the parties agreed to defer class certification proceedings to allow these preliminary issues to be addressed, it should not be lost on anyone that the class claims asserted in this case would seek $5,000 for everyone whose policy was canceled for nonpayment over a 10-year period, and given the number of cancellations at issue, that amount exceeds $1 billion. What was the first letter of that word? B. So the actual real-world implication, if we're talking about real-world implications, the real-world implication is that hundreds of thousands of policyholders who defaulted on their premium finance agreements would be permitted to not pay for their policies, claim their policies remained in effect, and collect $5,000 for each time Go Auto canceled their policy. Fortunately— It's called reverse insurance. I'm sorry? It's called reverse insurance. Correct. We don't believe the law permits that result. The last thing I want to address are the alternative reasons that plaintiff's claims fail. The first ties into what I just talked about, and that is that they're asserting a claim under the bad faith statute. You know, 93550 doesn't create a private right of action, and they're not actually seeking to have the policies reinstated because they want to make a claim under them. They just want to get a penalty under the bad faith statute, but the bad faith statute requires a knowing misrepresentation. Ms. Williams and Ms. Wright testified that they were not aware of any misrepresentation made to them, and any statement by Go Auto that the policies were canceled is not a knowing misrepresentation. The policies were canceled. Ms. Williams and Ms. Wright may be able to say, well, you didn't follow the process, and therefore the cancellation was invalid, but the policies were canceled, and if Go Auto says your policy was canceled, that's not an actionable misrepresentation. Second, Go Auto is entitled to immunity under 93550. That provision states that no liability of any nature whatsoever shall be imposed on the insurer as a result of failure of the premium finance company to comply with any of the requirements of this subsection. So to your point, if the employee is not a private carrier, that's a defect of what APAC did. If delivering the documents to the file cabinet isn't sufficient, that's something APAC did, and 93550 provides immunity to the insurer in the event that the finance company doesn't get it quite right. There's also immunity under 1266. It used to be 22636, but 1266 says there shall be no liability against any insurer for any statement made in any written notice of cancellation or any other communication specifying the reasons for cancellation or the providing of information pertaining thereto. Because the claim here is knowing misrepresentation, it necessarily means Go Auto said something about our cancellations that was incorrect and now I want my $5,000. 221266 specifically says that there is immunity from statements pertaining to cancellations. The plaintiff's, I will, I only have 20 seconds left. The plaintiff's will argue that those collateral issues about immunity and whether there's a knowing misrepresentation were not before the court. That's not correct. The lower court said in the scheduling order that he was going to address legal issues, preliminary legal issues pertaining to the merits of the plaintiff's claims. There's nothing in the law that prevents a defendant from seeking dismissal of a putative class rep's claim and the plaintiff's made no showing that they were entitled to or needed any discovery to deal with the immunity issues. Thank you. All right. Thank you, Mr. Simeon. Thank you. Judge Higginbottom, to get back to your question about the remand issue, if the question was directed towards whether or not the district court had jurisdiction in this case, it wasn't a question of jurisdiction. The basis of our remand was under the discretionary basis that the court could remand the case. And so it's not a jurisdictional question. So we're not contesting the jurisdiction. We never did in our motion for remand contest the court's jurisdiction in the case. We were seeking a discretionary remand under the act. I don't know if that better answers the question you were asking me a little bit earlier. I just want to point to a couple of things that were said. First, this argument about, well, Go Auto can't be liable for the actions or inactions or failures by the premium finance company. The problem with that argument is glaring. If the premium finance company did not send the notice of request for cancellation, it's not a notice, it's a request for cancellation in a proper manner, it was not, as the statute also requires, received by the insurance company by the proper manner that it was supposed to have been received. So it's a two-way street. It's sent by private carrier or by mail or by e-mail, but it has to also be received by private carrier, mail or e-mail. And so the problem is that it is Go Auto's issue that we are dealing with here, not the issue that was. Now, she wants to argue and Go Auto wants to argue, well, private carrier certainly means just private individuals. That completely ignores the history of the statute. The history of the statute showed that what the legislature meant when it talked about private carrier were mail service companies. And we're not just talking about FedEx and we're not just talking about UPS. Those are two of the examples. Well, there wasn't any history. There is legislative history through the changes in the statute. The statute originally said mail, mailing it by, and then it was changed to include private carrier, but it still said mailing by private carrier. Yes, I'm sorry. Well, I mean, no, it says three possible ways of delivery, doesn't it? No, I'm talking about before that, there's two changes in the statute. Okay. First, it only allowed mailing. Then it allowed mailing by mail or by private carrier. Clearly, the legislature still was saying the way you sent it was by mail, and so when it referred to a private carrier, it was talking about a mail service. It wasn't talking about the person that you call to come and pick something up and bring it to the person next door. They were talking about mail. That's what the history tells us. Then when they added the electronic mail is when it changed from mailing it to sending it. But that history tells us what the legislature meant by the use of that term private carrier. It was a mail service is what was meant by that particular private carrier. Now, they want to argue that, well, it's fine. It doesn't have to be certified. It doesn't have to be signed by anybody to be certified. Well, then can someone answer for me why it is, ever since they began this process back in 2011, every morning following the sending out of that email that was not signed, they got somebody to come in and sign it. They got someone to come in because they knew that certification requires it. Is it clear that the signature is supposed to be by an APAC person or by an insurance company person who is saying received? No. Is the signature indicating receipt or is it indicating certification? No. There's two different signings, Your Honor. First signing is the next morning after the email goes out, she even referred to this, it's printed off the next morning, and then it's signed by a supposed premium finance company employee signing the certificate. Now, you asked about whether there's a signature page on that certificate. Yes, it is. It's on the first page. You heard it referred to, there's a blank on that first page. You know what that blank was for? It was for an APAC employee the next morning to come and sign it. And that's what they did ever since they started this process back in 2011. If they didn't think it needed to be signed, they wouldn't have put that part of the process for them to come in. Nobody signs it before it goes out by the electronic mail, but someone always from the beginning of this would come in the next morning and sign it. Then in 2017, there was another signature process that was added that allowed someone to say that it was received. That's two different signings. So, yes, they understood signing was necessary for the certification, and by its very nature, signing is necessary for a certification here on this. Thank you. Okay. Thank you very much. We appreciate it. We will be in recess until 9 a.m. tomorrow morning.